## BENJAMIN A. GOULD vs. ABRAM RICH, Administrator.

G., the owner of a vessel bound from Boston to India, procured a letter of credit from W. & Co. of London, authorizing R., the master of the vessel, to value on them, at six months' sight, for any sum not exceeding £5000 in all ; and in case of any accident to R., by which he might be prevented from using the credit, authorizing P., S. & Co. of Batavia, or R. & Co. of Canton, to use the letter of credit for account of G. : G. gave this letter and a quantity of specie to R., with instructions to proceed to Batavia, call on P., S. & Co., and, if practicable, load with coffee and return direct to Boston ; but if he could not there load for home then to take there a cargo of rice, &c., proceed to Lintin, leave the vessel there go up to Canton, consult R. & Co., and if he could load with teas prudently, the to put all G.'s funds into the hands of R & Co., take the vessel to Wampoa, an sell the rice : R. proceeded to Batavia, and finding the price of coffee too high to load therewith for home, he purchased rice, &c. through the houses of P., S. & Co. at Batavia, and D. & Co. at Samarang, and paid therefor in six bills, drawn by him on W. & Co. under the letter of credit, amounting in the whole to £3601 2 10 : R. then proceeded to Lintin, conferred with R. & Co., determined to load with teas, &c., sold the rice, and put the proceeds of the sale, and the specie and letter of credit furnished by G., into the hands of R. & Co., who furnished a return cargo of teas, &c. : No accident happened to R., to prevent him from using the credit on W. & Co. : On the letter of credit, when put into the hands of R. & Co., there was an indorsement made by R., purporting to state the amount of the several bills that he had drawn thereon at Batavia; but one bill so drawn, to the amount of £1000, was by mistake omitted to be indorsed, so that the apparent balance on the letter was £1000 more than the real balance : R. & Co. thereupon drew on W. & Co. for the apparent balance

and furnished teas, &c. for G. to the amount so drawn for, in addition to the amoun of G.'s specie, &c.: All the bills so drawn were accepted and paid by W. & Co.: The cargo arrived at Boston, and was received by G., who gave notice to R. of the overdraft as soon as it was discovered, and R. insisted that the mistake was made by R. & Co., and not by himself: G. thereupon disposed of all the teas in the same manner, and paid the aforesaid bills to W. & Co. There was a loss on the whole cargo; and after it was ascertained that the overdraft was the mistake of R., G. brought an action against R.'s administrator to recover the damages sustained by the mistake. *Held*, that the action was maintainable, and that G. was entitled to recover the amount of actual loss sustained by him in consequence of R.'s mistake.

THIS was an action of assumpsit to recover a loss sustained by the plaintiff, as he alleged, in consequence of the negligence, error, or misrepresentation of John Rich, the defendant's intes tate, while said John was master and supercargo of the plaintiff's ship Arno, on a voyage from Boston to Batavia and Canton, and back, whereby an overdraft, and over investment of £1000 sterling were made on the plaintiff's account.

At the trial before *Wilde*, J. it appeared that in August 1835, said John Rich, being master of the plaintiff's said ship, was appointed and undertook to act as her supercargo, on said voyage, and that the plaintiff, and other shippers, gave him instructions, &c., the material parts of which are stated in the margin.*

---

* " Boston, August 22 1835.

Captain John Rich.    Dear Sir:  As master and supercargo of the ship Arno, I wish you to make all haste to Batavia, and there to call on Messrs. Paine, Stricker & Co., and if practicable to load with coffee, agreeably to the general instructions given by the shippers, and return direct to Boston as soon as possible," &c.    " First of all I wish you to purchase for me five hundred piculs of government Banca tin, &c.   But if you cannot load for home at Java, please take a cargo of the best white rice you can find, and proceed to Lintin.   Leave your ship there, and go up to Canton, and confer with Messrs. Russell and Company, and if you can load with teas prudently, you will please to put all my funds into their hands."   " Take the ship up to Wampoa, and sell the rice.   On this you are to receive a commission, and not Messrs. Russell and Company, but they will nevertheless aid you in disposing of it, as they have done to Captain Cleaveland.   My friends, Russell and Company, will send down some cassia in mats for you to take at Lintin, as you go up. Urge them to use all possible despatch in furnishing your cargo, but do not board at their house when in Canton, as they charged me $500 for Captain Henry's board when there in the Timour."   " But after conferring with Messrs. Russell and Company, should you find it impracticable or unsafe to load there, you can sell the rice at Lintin, and, as the last resort, go over to Manilla,

Gould *v.* Rich, Administrator.

The plaintiff introduced the receipt of said Rich, dated August 21st 1835, for the $15,000 in specie, and the letter of credit mentioned in the plaintiff's said instructions, said letter "to be negotiated in India, and the proceeds invested agreeably to the instructions, and the goods consigned to B. A. Gould, at Boston, per ship Arno."

It was in evidence, that upon the arrival of said ship at Batavia, said supercargo found the prices too high there to load for home, and concluded to purchase the tin and rice, as directed by the plaintiff, and to go on to Lintin : That the purchases there were made through Paine, Stricker & Co. of Batavia,

---

and take a cargo of sugar and hemp, &c. Please have my goods marked B. A. G. and consigned to me." "I wish you to use bills for the purchase of tin and rice at Batavia, and should you go to Canton, perhaps you may be able to negotiate your exchange at Batavia, to greater advantage than you can at Canton. In this case, you will do so, and carry the specie. I have mentioned Manilla only as a last resort. You cannot invest more than about half your funds there," &c. "For funds, I send on my own account fifteen thousand dollars, (Mexican,) $15,000, in specie, and a credit for five thousand pounds sterling." "You are to receive a commission of two and a half per cent. on all investments made at Java or Manilla, and two per cent. on those made at Canton. But you are to charge your commission on the sale of your rice cargo, and not on the purchase. In addition to your commission, I agree to pay you mate's wages, viz. thirty dollars per month, as master of the ship.

Benjamin A. Gould."

Upon this letter said Rich made the following indorsement : "I acknowledge the above to be instructions for the present voyage to India, and promise to conform to them, and I also agree to the terms and conditions therein set forth. Boston, 22 August 1835.　　　　　John Rich."

"Boston, August 20 1835.

Captain John Rich. Sir: As supercargo of the ship Arno, the undersigned, shippers by that vessel, wish you to proceed with all possible despatch to Batavia, and call on Messrs. Paine, Stricker & Co., and ascertain on what conditions a cargo of coffee can be obtained there," &c. "You will please give to each of us a just proportion of different qualities, &c., and to render to each of us a separate invoice and account, and to mark and consign our property as may be requested by us respectively," &c. "But should you be unable to load at Java, you will please proceed to Canton, and call on Messrs. Russell and Company, and there learn the prospect of loading with teas." "If you think, after advising with Messrs. Russell and Company, that it will answer to take a cargo of teas, you will please deliver our funds to them, and they will furnish a cargo agreeably to our request, which we shall forward by you. But should you be of opinion, after conferring with those gentlemen, that it will not be prudent to load with teas, then you can

and Darndells & Co. of Samarang, and were paid for by the following bills on Wiggin & Co., London, drawn by Captain John Rich, personally, payable to the aforesaid firms, or their order, under the aforesaid letter of credit, viz :

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| At Batavia, | No. | 1, | - | - | | - | - | - | £1000 00 00 |
| " | " | 2, | - | - | - | - | - | - | 1097 11 5 |
| " | " | 3, | - | - | - | - | | - | 549 16 00 |
| " | " | 4, | - | | - | | - | - | 162 10 00 |
| " | " | 5, | - | - | - | - | - | - | 227 5 5 |
| | | | | | | | | | £3037 2 10 |
| Samarang, | " | 6, | - | - | | | | - | 564 00 00 |
| | | | | | | | | | £3601 2 10 |

Whereupon there remained a balance on said credit, £1398 17 2, to be used and invested at Canton, which makes up the £5000 authorized to be drawn. And the plaintiff contended, that it was the duty of the supercargo to keep a just and true account of the bills drawn by him on said letter of credit, and to see that the same, or some correct indorsement thereof, accompanied the letter of credit into the hands of any person who might by

go to Manilla, &c. Thus we leave it with you to decide, after advising with our friends at different places, where to load for home. You will determine, at Canton, whether it is best to go to Manilla. We agree that you shall deduct two and a half per cent., if you load any where in India, except Canton, where the commission is two per cent., &c.

> B. A. Gould.
> Tho. Wigglesworth.
> J. P. Higginson,
> T. M. Thacher,
> Benj. Goddard,
> Nath. Goddard.
> Edmund Kimball."

" Boston, August 19 1835.

I hereby authorize Captain John Rich, of ship Arno, to value on Messrs. T. Wiggin and Company, London, at six months' sight, at any place in India, for account of Benjamin A. Gould, Esquire, of Boston, for any sums, not exceeding, in all, five thousand pounds sterling. And I hereby engage, as the authorized agent of Messrs. T. Wiggin and Company, that the bills of Captain Rich shall be duly honored when presented, if drawn within twelve months from this date. In case of any accident to Captain Rich, by which he may be prevented from using this credit, I hereby authorize either Messrs. Paine, Stricker and Company, of Batavia, or Messrs. Russell and Company, cf Canton, to use the same, for account of Mr. Gould.

> Robert Hooper, Jr., Attorney for T. Wiggin and Company."

him be intrusted therewith, or be by him requested to use the same, so that no overdraft should occur.

Captain Rich proceeded with his cargo of rice to Lintin, (near the mouth of the Canton River, say sixty miles below the city,) and, leaving the ship there, went up to the city; and, after conferring with Messrs. Russell & Co., as directed, deter mined to load there, and accordingly returned to his ship, and brought her, with the rice, to Wampoa, the usual place for loading, being about twelve miles below the city. The proceeds of the rice, with the specie of the plaintiff, and his original letter of credit, were by him passed over to the house of Russell & Co., who furnished a return cargo of teas, &c., for account of the plaintiff.

J. C. Greene, one of the house of Russell & Co., who was released and made a competent witness, testified, that when the letter of credit was so passed over to Russell & Co., it bore the following indorsements, which were all the indorsements that appeared on said letter at the time of the trial:

" Batavia, December 17 1835.

The undersigned have negotiated for account of the within letter of credit, in five sets of bills, two thousand and thirty seven pounds, two shillings and ten pence, sterling.

Paine, Stricker & Co.　By W. G. Reed."

" Samarang, 30th December 1835.

The undersigned have received on account of the within letter of credit, in three sets of bills, in favor of Messrs. Paine, Stricker & Co., at Batavia, five hundred and sixty four pounds.

(£564.)　　　　　　　　　　Darndells & Co."

Said Greene also testified as follows: " The letter of credit passed under my personal observation at the time. It was delivered to me by Captain Rich, the supercargo; and, at the time of so delivering it, he made a calculation, in my presence, upon the back of the letter of credit, in pencil, of the amount which had been drawn for, and the amount which remained to be drawn for; and he represented to me that those amounts were as contained in that pencil memorandum, namely, the amount already drawn two thousand six hundred and one

pounds, two shillings and ten pence ; and the amount remaining to be drawn, two thousand three hundred and ninety eight pounds, seventeen shillings and two pence, which latter amount he directed us to draw for, and to invest. Our house drew, under the said letter of credit, for the whole amount which Captain Rich represented to be the balance undrawn for. We drew by his directions, to pay for the homeward cargo purchased. The amount so drawn was invested in Chinese produce — I think chiefly, if not wholly, in teas — and charged to account of B. A. Gould. It appears, from subsequent information, that we did draw for a larger amount than really remained to be drawn for. We did so because Captain Rich represented the amount we drew for to be the real balance remaining undrawn, and that it was needed for investment. According to mercantile usage, it was the duty of Captain Rich, the supercargo, to see to and keep the account of bills drawn on said letter of credit; and such overdraft, if any, was made by his means. When our house drew for the aforesaid amount, we had no notice from said Rich, or from any one else, that any further sums had been drawn on said letter of credit than appeared by the aforesaid pencil memorandum. We had no reason whatever, from his statements, or otherwise, to believe that a draft for £1000 sterling had been made, December 16th 1835, at Batavia, on account of said letter of credit, or at any other time or place, or any other draft, so as to reduce the amount remaining to be drawn. The said supercargo employed my house, of Russell & Co., in Canton, to do the business of the said ship and her cargo. We followed his advice, or, more properly speaking, his orders. He had entire control of all the business, and every thing was done by his orders. The whole business of the ship was transacted by us, under the direction of Captain Rich, whether for account of B. A. Gould, or any other person. The investments were invoiced, marked, shipped, and consigned, agreeably to the instructions of Captain Rich. I do not recollect whether or not the funds of each shipper were invested separately. We had no instructions whatever from B. A. Gould. Captain Rich acted as supercargo of the ship Arno, and had the entire direction of her

business.  Russell & Co. were mere agents, acting under his orders.  His acts were such as belong to the office of supercargo."

The penciling upon said letter of credit mentioned above by Greene, was in the words and figures following :

" Benjamin A. Gould, Esq.

Exchange for  -  -  -  -  -  -  -  -  £5000  00  00
Drawn  -  -  -  -  -  -  -  -  -  -  2601  2  10,"

omitting the bill drawn at Batavia for £1000.

The bills drawn by Russell & Co., and charged to the plaintiff in the accounts settled by Captain Rich with them, amounted to £2398 17 2, (or £1000 more than was authorized by the original letter of credit,) and were signed by Russell & Co. The others, drawn in Batavia and Samarang, were all signed personally by Captain Rich, payable to Paine, Stricker & Co. and Darndells & Co. ; and all were duly accepted and honored by Wiggin & Co., and all the goods furnished for the plaintiff (including the avails of this overdraft of £1000) were marked B. A. G. and consigned to the plaintiff, at Boston, in the manner pointed out in his letter of instructions, and there was no mark, or any way by which the investment of this excess could be separated from the avails of the rice, specie, and other funds of the plaintiff.

Captain Rich, with the Arno and her cargo, arrived at Boston September 1836; and it was then evident, as testified by the plaintiff's clerk, a loss must be sustained on the goods or teas so purchased.  Captain Rich being, at the time of his return to Boston, out of health, went, as soon as he had landed his cargo, to visit his friends at Hallowell, Maine, leaving with the plaintiff all the invoices and accounts of his voyage, as well the accounts of Russell & Co., and those of the merchants at Batavia and Samarang, as his own.  The plaintiff, being then busily engaged, did not then discover the overdraft and over investment ; but in the course of a few days, the same was ascertained, and, on the 14th of October 1836, the plaintiff forwarded o Captain Rich the following letter :

Gould *v.* Rich, Administrator.

"Boston, October 14 1836.

Captain John Rich. Dear Sir: Your letter of the eleventh inst. is received. I am glad to perceive by it that you intend to visit Boston soon. I have, much to my surprise and regret, discovered by your account, and Messrs. Russell & Co., that the credit by the Arno, on my account, £5000 sterling, has been overdrawn by £1000, amounting, by your and their statements, to £6000, as follows:

| | | | | | | |
|---|---|---|---|---|---|---|
| Bills drawn at Batavia, | No. 1, | - | - | - | | £1000 00 00 |
| "   "   " 2, | - | - | - | - | | 1097 11 5 |
| "   "   " 3, | - | - | - | - | | 549 16 00 |
| "   "   " 4, | - | - | - | - | | 162 10 00 |
| "   "   " 5, | - | - | - | - | | 227 5 5 |
| | | | | | | £3037 2 10 |
| "   Samarang, " 6, | - | - | - | - | | 554 00 00 |
| By Russell & Co., | - | £2088 17 2 | | | | £3601 2 10 |
| "   " | - | 310 00 00 | | | | 2398 17 2 |
| | | | | | | £6000 00 00 |

This is statement as per account rendered. Respectfully,

B. A. Gould."

To this letter Captain Rich replied as follows:

"Hallowell, October 18 1836.

B. A. Gould, Esq. Dear Sir: Your favor of the four-teenth instant I have this morning received, and hasten to answer it. I am surprised that Messrs. Russell & Co. should have made such a mistake. The bills which I drew in Batavia and Samarang, were registered upon the back of the letter of credit; and, when I gave up the funds to Messrs. Russell & Co., I gave them a statement of what I had drawn for on your account. I see by your letter that they drew for 17s. 2d., which would have been the balance of the odd shillings and pence of the remaining amount. I shall come to Boston during next week, if my health will permit of it. I have been quite ill the last three days, but am better again.

Respectfully, I remain yours, John Rich."

John M. Forbes, of the house of Russell & Co., having been made a competent witness by a release, testified that he was in Canton when the Arno arrived : That the Arno and other ships

lay at Wampoa, twelve miles from Canton, and that it took a day's time to go to and come from the ship. The witness produced and identified the original letter of credit, and said it had never, within his knowledge, been out of the possession of the house or some member of the firm ; that he received it of Greene (one of the firm) at Canton, and brought it to Boston in March 1837 ; and that when he received it, it had all the indorsements thereon which now appear. He also testified that it was customary for his house in Canton to draw bills, on letters of credit, in the form in which they drew in this instance ; that if Capt. Rich had drawn the bills, they might have been sold at a less price ; and that it was not the usual custom for the captain of a ship to draw in such cases.

The defendant introduced testimony for the purpose of showing that it was the custom in Canton for the master of the vessel to draw bills in a case like the present.

Forbes further testified; that soon after he arrived in Boston, (March 1837,) he had a conversation with the plaintiff, and afterwards with the defendant, concerning the letter of credit, &c., and the defendant wished the original letter to be sent for, and said he should be satisfied, if that were produced. A copy, certified by the consul, had been received, with which he was dissatisfied. The witness understood from this conversation, that upon the production of the letter of credit, with Capt. Rich's handwriting upon it, the defendant would be satisfied with the course taken by the plaintiff. Capt. Rich himself, in 1837, said he should be satisfied if the original letter of credit was conformable to the consular certificate ; and both he and the defendant urged the witness to send to Canton for the original.

It was in evidence that all the bills drawn by Capt. Rich and by Russell & Co. were duly accepted, and paid by Wiggin & Co., and their acceptance notified to the plaintiff, who had large accounts with them, and remitted to them, from time to time, on general account, whereby he paid those bills, to the amount of £6000.

The plaintiff, having taken charge of the whole of the Arno's cargo that was bought for him, before he was aware of the over-

draft, caused the teas, &c. that were purchased with said over-draft to be sold, and credited the proceeds to Capt. Rich ; and afterwards, but before the extent of the damage sustained by the plaintiff was ascertained, made up an account current, stating a certain sum as the balance due from Capt. Rich on the 31st of December 1838 ; said sum being the difference between the £1000 and the (supposed) proceeds of the teas, &c. purchased therewith. This account was not accepted by Capt. Rich.

The plaintiff introduced the correspondence which is copied in the margin.\*

---

\* "Richmond, Virginia, May 31 1837.

Benjamin A. Gould, Esq. Dear Sir: I have today received your favor of May 5th, and contents noted. I feel satisfied with what you have done, and can only say, do as you think proper." (Referring to certain teas of Rich's which came in the Arno, and remained unsold, and which were left with the plaintiff, for sale.) " I leave this tomorrow, for the Springs, where I hope to be benefitted — there is much need of it. My health is not so good as when I last wrote you. The warm weather is too debilitating. I hope the mountain air will better agree with my complaint. Respectfully, your obedient servant, John Rich."

" Boston, November 7 1837..

Captain John Rich. Dear Sir: Since I saw you, I have made no progress in the sales of your adventure per Arno, thinking the market for teas to be improving faster than the interest of goods unsold. I think we shall be paid for holding. I have never yet sold a pound of my young hyson, per Arno, and only one chop of souchong. I hope yet to obtain for your adventure a satisfactory price. Mr. I. Coolidge, of the house of Russell & Co. Canton, has returned within a few days to Boston. He confirms the statement in the consular certificate, respecting your memorandum of bills drawn on the credit of £5000 sterling ; but I have written to the house that you are not satisfied with the certificate copy of the letter of credit, as has Mr. A. Heard, I believe, also, and requesting them to send either the original, or an entire copy, by the consul, under his seal, which I think would be admitted as evidence in a court of law here. I am sure you do not wish me to abide the consequences of this mistake, after the severe and successive losses I have sustained on that and the subsequent voyages to Canton; for you voluntarily said, that if the mistake should prove to be yours, you would take the consequences ; but, presuming it to be the error of the house, their partner here, Mr. J. M. Forbes, consented to make up the deficiency, in case it should prove so. B. A. Gould."

" Hallowell, November 12 1837.

Benjamin A. Gould, Esq. Dear Sir: Your letter of the 7th instant I have received, and am happy to hear teas are looking up. I hope, before spring, you v ill make sales of all I have in your hands, at a fair price. I am told, by my brother, you have something due me in your hands, Whatever it may be, please

Upon this evidence, the plaintiff, among other points, contended, 1st, that the defendant was liable on the original promise and undertaking ; 2d, that the facts showed a valid subsequent promise, by which he was bound ; 3d, that the overdraft having been made by the request of Captain Rich, for the amount and in the manner by him directed, and Wiggin & Co. being thereby requested to charge the same to plaintiff's account, and the same having been paid by plaintiff, in consequence of said supercargo's express statements, the defendant was chargeable therefor ; and 4th, that the actual amount of real damage sustained by the plaintiff was the true measure of damages, and that the plaintiff was not estopped by the account rendered before that loss was actually known, the same being only conventional or proximate, and not accepted by the other party, but was at liberty, after managing these goods, as he did other goods of like kind, belonging to Captain Rich and to himself, to charge the actual eventual loss sustained, which was materially larger than the amount stated in said account.

The defendant, on the other hand, contended, 1st, that as the overdraft was made in consequence of an erroneous indorsement upon the letter of credit, made by the plaintiff's agents, Paine, Stricker & Co., in Batavia, who negotiated the bills of exchange drawn thereon, and purchased the cargo for the Arno, at that port, agreeably to the instructions of the plaintiff to Captain Rich, his estate was not liable for any loss arising out of the overdraft ; 2d, that as Captain Rich strictly obeyed the plaintiff's instruction by passing over his funds into the hands

---

pay it to my uncle, who is my agent, as I wish to invest all my funds in good stocks. I see, by your letter, you speak of a Mr. Coolidge, of the house of Russell & Co., arriving, a few days since, from Canton, confirming the statements already received from the American consul's certificate of what I had drawn for. Who Mr. Coolidge is, I know not. He was not in the house when I was there. I have wrote Russell & Co. for the original letter of credit, and the list, a true copy of what I had drawn for in the Island of Java. Until I can see them, I shan't consider myself accountable. Why they should be so loath to give up these papers, I cannot tell. If they are valuable to them, they can be kept as sacred here as in Canton. Mr. Gould, I have no confidence in Mr. Greene. Please inform me, from time to time, how you are getting on.   Respectfully, yours,                                                           John Rich."

of Russell & Co. in Canton, and they undertook, afterwards, to draw for the balance of said letter of credit, without authority, it appearing, by the terms of said letter of credit, that they were authorized to draw only in case of accident to Captain Rich, and no such accident being proved, said Russell & Co., who made the overdraft, were liable, and not the estate of Captain Rich 3d, that the estate of Captain Rich could not be made liable to the present plaintiff, because the letter of credit authorized bills to be drawn for £5000, and no more ; and the drawing of any bills thereon, by the plaintiff's agents, beyond that amount, was a departure therefrom, and could not bind the plaintiff; and that no person, other than the actual drawers of the bills which constituted the overdraft, could be bound to pay the same, unless by subsequent adoption or ratification of the act of drawing : That Wiggin & Co., the drawees, were not bound to accept the overdraft ; and, having voluntarily done so, they could look only to the actual drawers, Russell & Co., and could not charge the plaintiff; and that the plaintiff, by voluntarily paying the overdraft, could not thereby acquire any right of action against the present defendant: That if Captain Rich was liable to any one, it must be to Russell & Co., after they had paid the overdraft, and that such liability could not be tried in this action, in which Russell & Co. were witnesses ; 4th, that no subsequent promise, by Captain Rich, to abide the loss, had been proved, or could be inferred from the evidence ; and that if there was any such promise, either expressed or implied, the same was a promise to pay the debt of another ; and, not being in writing, was void, by the statute of frauds, and was also without consideration, and therefore void, inasmuch as the plaintiff had paid the bill before any such supposed promise was made.

It was agreed, that the jury should determine whether or not Captain Rich made the memorandum in figures, &c. on said letter of credit, and caused the mistake to be made ; and that if the jury were of opinion that he did, they might find a verdict for the plaintiff; if otherwise, for the defendant; all other questions to be submitted to the full court, they having liberty to draw from the evidence any inferences that a jury lawfully

might draw therefrom, and to alter or amend the verdict accordingly, and render such judgment as they might deem proper.

The jury returned a verdict for the plaintiff, for $1200.

*Dexter & Osgood*, for the defendant. The plaintiff was not bound to pay the overdraft, nor to accept the goods therewith purchased ; and is not entitled to maintain an action for a loss which he might have avoided. So far as any of the agents for transacting the business of the voyage of the Arno were authorized to draw bills which would bind any person besides themselves, they were authorized by the special written power contained in the plaintiff's instructions and the letter of credit. As they were *special agents*, and as the overdraft was not within their authority, it was null and void, as to the plaintiff and Wiggin & Co. Story on Agency, §§ 126, 131 – 133, 162. *Rossiter* v. *Rossiter*, 8 Wend. 494. *Snow* v. *Perry*, 9 Pick. 542. *Hatch* v. *Taylor*, 10 N. Hamp. 538. *Hammond* v. *Michigan State Bank*, 3 N. York Legal Observer, 46. If Captain Rich, as master or supercargo, could be regarded as the plaintiff's *general agent* for the voyage, yet he could not hypothecate the ship, nor draw bills which would bind the plaintiff, even for necessary repairs of the ship ; much less had he authority to draw bills which would bind the plaintiff, beyond the amount of the letter of credit, for the purchase of a cargo ; while he had the plaintiff's funds in his hands, to be applied for that purpose. Story on Agency, § 122. *The Fortitude*, 3 Sumner, 228. *Cupisino* v. *Perez*, 2 Dall. 194.

The overdraft not being within the authority delegated by the plaintiff or Wiggin & Co. to Captain Rich or Russell & Co., and being drawn by Russell & Co. in their own names, they alone were bound to pay it to the holder. Story on Agency, §§ 157, 268, 269. Story on Bills, § 76. Therefore, though it is found by the jury that the overdraft was made by reason of the mistaken representation of Captain Rich to Russell & Co., when he delivered the letter of credit into their hands, pursuant to his instructions ; yet as the overdraft did not bind the plaintiff, he has no cause of action against the defendant, because the damage was done to Russell & Co. and not to

the plaintiff; and the misrepresentations, &c. of an agent will not bind the principal, unless they are made respecting matters within the scope of the agent's authority.   Story on Agency, §§ 134, 135.

Where a loss happens by the negligence of one of two agents, while engaged in the business of their agency, they must look to each other for indemnity, and not to the principal.   *Farwell* v. *Boston & Worcester Rail Road*, 4 Met. 49.

The plaintiff cannot, by voluntarily, and without the defendant's consent, paying the overdraft, which did not bind him, but bound Russell & Co., acquire a right of action against the defendant for the loss, and by the aid of the testimony of Russell & Co. recover the loss which was theirs and not his.   *Child* v. *Morley*, 8 T. R. 610.   If Wiggin & Co. had refused to accept the overdraft, and it had been protested, Russell & Co. would have been bound to pay it to the holder, with all loss and damage, and might have recovered back the amount in an action against Captain Rich, if they could have proved that the mistake was his.   But they could not have testified in such action, and Captain Rich might have defended by showing that Russell & Co. drew without authority ; no accident having happened to prevent him from drawing, and a delegated authority not being assignable.   *Coles* v. *Trecothick*, 9 Ves. 251.

Captain Rich was bound, by the plaintiff's instructions, to deliver the letter of credit to Russell & Co. on his arrival at Canton.   But, unless some accident should prevent him from drawing for the balance of the credit, he was not bound to render to Russell & Co. any account of the bills already drawn thereon, nor to indorse them on the letter, nor to make any statement of the balance to be drawn for.   As Russell & Co. had possession of the letter of credit, by the express orders of the plaintiff, they were bound by the terms thereof to request Captain Rich to draw for the balance, and in that case no mistake would have been made, or if made, Captain Rich would have been bound to pay the bill and all damages, as drawer The plaintiff is therefore bound to show that some accident pre

vented Captain Rich from using the credit; and this he could have done, by his witness Greene, if there were any such acci dent. No such proof being given, the inference is, that none existed, and that Russell & Co. drew without authority, and in their own wrong; and if the plaintiff has assumed the loss, under an arrangement with them, he must look to them for his indemnity, and cannot recover of the defendant.

The plaintiff will rely on the *antecedent* express promise of Captain Rich that he would conform to the letter of instructions. But, so far as the plaintiff is concerned, Captain Rich performed that promise.

The plaintiff has ratified and adopted the overdraft and investment, so far as the defendant is concerned, by omitting to repudiate them, and by paying the draft, and receiving and selling the goods, under an arrangement with Russell & Co., and without the consent of Captain Rich or of the defendant; notwithstanding any thing the defendant has said or done. For a ratification may be shown by the acts of the plaintiff, although he may have expressly declared that he would not sanction the proceedings. Story on Agency, § 259. *Hatch* v. *Taylor*, 10 N. Hamp. 538.

The plaintiff will also rely on a promise of Captain Rich or the defendant, made *after* the plaintiff had paid the overdraft. But no such promise is proved, or can be inferred from the evidence. Or if such promise could be inferred, it was not made till after the plaintiff had paid and taken up all the bills; and any promise then made would be without consideration and void. *Mills* v. *Wyman*, 3 Pick. 207. *Nelson* v. *Boynton,* 3 Met. 399. *Fenn* v. *Harrison*, 3 T. R. 757.

In any event, the damages must be the difference between the cost of the goods at Canton and their market value upon their arrival at Boston, as by the plaintiff's account rendered as of 31st December 1838.

*C. G. Loring & H. W. Fuller*, for the plaintiff. As the loss which the plaintiff has suffered was caused by the mistake of Captain Rich, his estate must bear it. And the evidence shows that Captain Rich and the defendant both engaged that the loss

hould be thus borne, if the mistake should be shown not to have been made by Russell & Co. The plaintiff never consented to bear the loss. As soon as he ascertained that there was an overdraft, he gave notice to Captain Rich that he should look to him for indemnity ; and he did not pay the drafts nor take the goods, till he was assured that Russell & Co., and not Captain Rich, made the mistake. After all this, the defendant is estopped to say that no accident occurred to Captain Rich, which prevented his using the letter of credit, and that he alone had authority to draw bills at Canton. *Chapman* v. *Searle*, 3 Pick. 38. *Bonaffe* v. *Woodberry*, 12 Pick. 463. *Wardell* v. *Hughes*, 3 Wend. 418. Indeed, the state of facts existing at Canton was tantamount to an accident, or rather was an accident, within the meaning of the letter of instructions.

It is immaterial whether the defendant is liable, or not, to Russell & Co., provided Captain Rich caused the plaintiff to pay the drafts. If he or the plaintiff was liable to them, the defendant is liable to the plaintiff. Story on Agency, §§ 217, 224, 228. *Erick* v. *Johnson*, 6 Mass. 193. *Anderson* v. *Highland Turnpike*, 16 Johns. 86. *Perkins* v. *Washington Ins. Co.* 4 Cow. 659. *Manella* v. *Barry*, 3 Cranch, 415. *Locke* v. *Stearns*, 1 Met. 560. *Earle* v. *Hall*, 2 Met. 353. The fact, that Russell & Co. drew the bills is immaterial, because Captain Rich misled them. 3 Wend. *ubi sup.* *Hice* v. *Kugler*, 6 Whart. 336.

Russell & Co. by drawing, and Wiggin & Co. by accepting the bills, showed that they understood that, by mercantile usage, the bills were drawn conformably to the instructions. And if Captain Rich had drawn the bills, it would not have varied the liability of any party. So that it is immaterial whether Russell & Co. had authority to draw the bills ; for they must have indorsed them, if they had not drawn them.

The plaintiff, having paid the overdraft *bonâ fide*, is entitled to all the damages which he has sustained, and is not bound by his statement of the account which he made provisionally, and before his full loss. *Frith* v. *Sprague*, 14 Mass. 455. *Ford* v. *Keith*, 1 Mass. 139. *Burrill* v. *Smith* 7 Pick. 291. *Shaw* v. *Loud* 12 Mass. 447.

HUBBARD, J.   The facts out of which the difference between the parties arises are simple.   A mistake has been made, and in consequence of it a loss has occurred ; and the question is, whether the principal or agent shall bear the burden.   The loss was not caused by a violation of orders, nor by an error of judgment, but through negligence or accident in the casting up of a column, in order to ascertain the amount which at the time had been drawn against the letter of credit held by the defendant's intestate for account of the plaintiff.   The cause has been elaborately and ingeniously argued, and the law touching principals and agents cited at great length.   But we do not think it necessary to review the decisions and treatises cited, nor go minutely into a discussion of all the points which have been raised in the case.   The principles upon which the case rests do not require it.

The error, it is said in the argument for the defendant, was made by Paine, Stricker & Co. of Batavia — who are also alleged to be the agents of the plaintiff ; and the loss therefore, if to be borne by any persons other than the plaintiff, should be borne by them.   The defendant, in pursuance of his instructions, proceeded on his voyage to Batavia, and there, through the house of Paine, Stricker & Co., made sundry purchases of goods, to the amount of £3037 2 10.   On the letter of credit was an indorsement of only £2037 2 10, signed " Paine, Stricker & Co. by W. G. Reed."   Whether this error was made by Paine, Stricker & Co., or their clerk, or whether the mistaken amount was handed to them by the defendant's intestate, does not appear, nor do we think the fact important to be settled ; because, whether Paine, Stricker & Co. were bound to make the indorsement or not, we think the supercargo, the defendant's intestate, who ordered the purchases and had received the invoices of the goods, and the accounts of the house, and who was also to use the residue of the credit at some other port, was bound to see that the indorsement, which he either required or permitted to be put upon the letter of credit, was correct ; not only for his own protection, but as well for those who might receive bills on the faith of the letter of credit, as for the house in London upon whom they would be drawn ; and especially to guard the rights of his employer.

It follows, from the facts proved in the case, that the accounts and invoices, as made up at Batavia, were correct; and as the letter of credit was taken away by Captain Rich, the house in Batavia had no means of knowing the mistake in the receipt, and of correcting the error; while on the other hand, Captain Rich had the means in his power, and it would seem, that if he had examined his accounts with any care, he must have known what was the amount drawn in the island of Java, before having occasion to use the credit again.

It is contended by the defendant's counsel, that Captain Rich obeyed the plaintiff's instructions by passing his funds into the hands of Russell & Co., and that they undertook to draw for the balance of the credit without authority, as no accident had happened to Captain Rich; and that by so drawing, Russell & Co. made the overdraft, and therefore they are liable for the loss, and not Captain Rich.

It appears, that at the time when Captain Rich delivered the letter of credit to Russell & Co., he made a pencil memorandum on it, for the purpose of showing what amount remained to be drawn for; and he made the sum remaining £2398 17 2. This fact has been found by the jury, and that he thus caused the mistake, so far as Russell & Co. were affected by it.

It is clear that no "accident" happened to Captain Rich within the meaning of that term as used in the letter of credit; and we think the drawing of the bills cannot be justified under that clause in the letter. There occurred no unforeseen event or misfortune, to which the term "accident" applies. The progress of the voyage was similar to that of others, and according to the probable expectations of the parties.

The argument is, that Russell & Co. volunteered to draw the bills without authority; the letter of credit being restricted, so that only "in case of any accident to Captain Rich, by which he may be prevented from using this credit, thereby authorizing either Messrs. Paine, Stricker & Co. of Batavia, or Messrs. Russell & Co. of Canton, to use the same for account of Mr. Gould.'

Whatever objections Messrs. Wiggin & Co. might have raised to accepting bills drawn by Russell & Co., unless some accident

was shown to have happened to Captain Rich, we do not think important to consider, for the purpose of deciding the present case. Captain Rich was the supercargo of the ship Arno, and as such was intrusted with the funds of the owner, to manage as he should think best, under his general instructions, and especially with authority to put his funds into the hands of Russell & Co.; and we think that so far as the defendant's intestate was concerned, by virtue of the powers intrusted to him by the plaintiff, he could direct Russell & Co. to draw the bills, if he should think it advantageous, rather than do it himself. It was no more than a fair and liberal construction of the orders under which he acted; and was doing, by agents he had a right to employ, what they, in his judgment, could do better than himself. Nor was there any breach of trust on his part; for if he had drawn the bills himself, the funds thus obtained he would immediately have passed into their hands. Nor do we think there was any violation of the letter of the instructions; for the letter of credit, and the bills authorized to be drawn by virtue of it, were funds of the plaintiff. While it is the duty of all masters and supercargoes faithfully to obey their instructions, yet, from their very nature, when given in relation to a foreign voyage, to be prosecuted at different ports and in distant countries, amidst fluctuating markets and changing seasons, such orders are to receive a liberal construction, and the master is to be justified when acting honestly within the spirit and scope of them, although he may seem to violate the letter. Such discretion as a liberal construction allows is a necessary ingredient in the authority conferred, and is required by the interests of commerce.

Whatever was the mercantile usage at Canton, in relation to bills drawn under letters of credit from agency houses in London, if any usage existed, this at least is certain, that the house of Russell & Co. made no hesitation in drawing the bills themselves, by virtue of such credit, and of thus rendering themselves liable as drawers in case of their protest. Nor did the house in London demur as to accepting them, on account of their being thus drawn.

But it is argued, that as Russell & Co. made the overdraft,

they are responsible for the loss, and not Captain Rich, and that it is to them the plaintiff should look, as his agents, who have been guilty of negligence in the discharge of their duty.   If the mistake had originated with them, I see no reason to doubt their liability to make good any loss occasioned by their mistake ; nor do I think that in such an event they could, in answer to a claim on them, deny the agency, and say they were acting solely for Captain Rich, and were accountable only to him.   By accepting the trust reposed in them by Captain Rich, under the orders by which he was governed, they became the agents of the plaintiff, and were responsible to him for the manner in which they conducted their agency ; for as Captain Rich had the right to appoint them, they being in good standing as merchants at the time, he was not responsible for their misconduct, nor were they liable to him, the interest being wholly in the plaintiff.   But as the mistake originated with Captain Rich, and they had no means of detecting it, and as they drew by his direction, they have been guilty of no neglect in the execution of their undertaking ; and having incurred no liability, they are under no obligation to the plaintiff to make good his loss.

Again ; if we entertained doubts on this point, we are still of opinion that Captain Rich could not take this objection ; for as he put the funds into the hands of Russell & Co., and authorized them to draw the bills, he should not now set up his own mistake and wrongful act, if it was one, to defend himself against the plaintiff's claim in the present case ; the injury not arising from their drawing the bills, but from his neglect in directing them to draw for too large an amount.

What was the duty of Messrs. Wiggin & Co. in relation to the acceptance and payment of the bills, so far as they extended beyond the letter of credit, we think is not important to consider. But from the views we have already taken of this case, it follows, that if the bills exceeding the £5000 had been protested for non-acceptance, and had been returned to Canton, and taken up by the drawers, Russell & Co., they would have had a good cause of action against the plaintiff for the loss caused by the

47 *

neglect of Captain Rich, and would not have been compelled to look to him for redress ; his acts, as the agent of the plaintiff, being binding on the plaintiff.

But it is contended, on behalf of the defendant, that the plaintiff was not bound to pay the bills to Messrs. Wiggin & Co. beyond the £5000, and that he had no right to make himself the creditor of the defendant by thus assuming this debt. The principle is indeed well settled, that a man cannot, by paying the debt of another without his request, make himself the creditor of that other.   In such a case, the law raises no promise So far, however, as Messrs. Wiggin & Co. were concerned, they were not creditors of Captain Rich.   But we think that rule of law is not applicable to the present case.   The plaintiff was placed in peculiar circumstances.   The goods had been purchased under the authority of his agent ; they were bought on his account, were invoiced and shipped in his name, were mixed with goods he was absolutely bound to pay for, and he was assured by Captain Rich, the mistake was Russell & Co.'s. He was called upon to act promptly ; either to refuse to pay the bills, and turn Wiggin & Co. round to Russell & Co., and thus greatly increase the expenses, in case it should prove that he was liable to Russell & Co. for the purchase, or to provide for them as they matured.   Without therefore undertaking to decide what the situation of the parties would have been, if he had refused to pay Wiggin & Co., we think, under the circumstances we have mentioned, he was justified in so doing, and did not thereby voluntarily become the creditor of Captain Rich. And surely Captain Rich had no reason to complain of the payment ; for, supposing him ultimately liable to pay the bills, it was for his benefit that Mr. Gould should pay them, rather than that a claim should be made by Wiggin & Co. on Russell & Co., and by them on Captain Rich, or that a claim should be made by Wiggin & Co. on Captain Rich.

It is further argued that the plaintiff ratified the transaction, by taking the goods to his own account and paying for them, and therefore he cannot now call on the administrator of Captain Rich   But we think the facts, as stated, do not war

rant us in drawing such a conclusion. The plaintiff gave immediate notice of the overdraft, and Captain Rich contended that the mistake was made by the house in Canton, and not by himself, and it was determined to send out and ascertain the fact; one of the house here agreeing to make good the loss, if the mistake was theirs. Captain Rich did not, in the event the mistake was his, deny his liability; nor did he request the plaintiff not to pay the bills; nor did he ask him to sell the goods immediately; nor did he take any step by which he gave the plaintiff to understand that he must assume the transaction. The plaintiff had received the goods mixed with others, as one transaction. Those purchased with the overdraft could not be distinguished from the rest. The master gave no intimation of the fact, being ignorant of it himself. The retaining of the goods, situated as the plaintiff was, was not an assumption by him of the profit or loss on the purchase, nor a taking of it to his own account. The plaintiff sues for a breach of duty on the part of the supercargo, and the case does not depend upon the doctrine of repudiating or rescinding the contract. See *Cunningham* v. *Bell*, 5 Mason, 161.

We also feel warranted in drawing the conclusion, from the facts in evidence, that there was an agreement on the part of Rich, that if the mistake should be found to have been made by him, and not by Russell & Co., he would abide the loss. The voyage terminated in September 1836, and Captain Rich, being out of health, went to Hallowell, Maine, to visit his friends. In October, the plaintiff informed him of having discovered, by the accounts, that the credit had been overdrawn £1000. Captain Rich immediately replied, by expressing his surprise that Russell & Co. should have made such a mistake. He was in Boston prior to April 24th 1837, previous to or about which time Mr. Forbes, one of the house of Russell & Co., had agreed that they would bear the loss, if the mistake was theirs; and in November of that year, the plaintiff, in a letter to Captain Rich, says: " I am sure you don't wish me to abide the consequences of this mistake, after the severe and · successive losses I have sustained on that and the subsequent

voyages to Canton; for you voluntarily said, that if the mistake should prove to be yours, you would abide the consequences; but presuming it to be the error of the house, their partner here, Mr. J. W. Forbes, consented to make up the deficiency, in case it should prove so." To which letter Captain Rich replied soon after, and said: "I have wrote Russell & Co. for the original letter of credit and the list, a true copy of what I had drawn for in the island of Java. Until I can see them, I shan't consider myself accountable." If the plaintiff had ratified and adopted this act, these letters would not have been written. On the contrary, they furnish evidence of an agreement that Captain Rich would bear the loss, if the mistake should prove to be his; and we think this was not a promise to pay the debt of another but agreeing merely to bear the consequences of his own neglect and carelessness, by reason of which the plaintiff had suffered; and, by thus engaging to bear the loss, releasing the plaintiff from the necessity of calling upon Russell & Co. for reimbursement, and turning them round upon himself. But we think the case does not rest on this point, but upon the duty of the supercargo, as the agent of the owner, faithfully to perform the trusts reposed in him, and his consequent liability to make good a loss resulting from a breach or neglect of duty.

In regard to the damages the plaintiff is entitled to recover, we think he is not bound by the account of *pro formâ* sales said to have been rendered by him; the defendant not having agreed to settle according to it. The plaintiff gave Captain Rich all the necessary information with regard to the goods, and he made no objection to the course of proceeding followed by the plaintiff. The plaintiff did by this part of the adventure as by the other goods, and we are of opinion that the actual loss sustained by the plaintiff is the true amount of damages caused by the neglect of the supercargo, and for which his estate is liable; and unless the parties can agree on the amount, an assessor will be appointed to make it up, or the case will be sent to a jury to ascertain it.